Jessica Boar Del Cid (JB5755)
Diane C. Hertz (*pro hac* motion pending)
**Bingham McCutchen LLP**
399 Park Avenue
New York, NY 10022
Tel. 212-705-7000
diane.hertz@bingham.com

James C. McGrath (*pro hac* motion pending)
**Bingham McCutchen LLP**
One Federal Street
Boston, MA 02110
Tel. 617-951-8000
james.mcgrath@bingham.com

*Attorneys for Plaintiff, General Motors LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GENERAL MOTORS LLC,<br><br>　　　　　　　　Plaintiff,<br>-v-<br>ENGLEWOOD AUTO GROUP, LLC,<br><br>　　　　　　　　Defendant. | CIVIL ACTION NO.<br><br>**ELECTRONICALLY FILED** |

**COMPLAINT FOR DECLARATORY JUDGMENT**

By this Complaint, plaintiff, General Motors LLC ("GM" or "Plaintiff"), seeks a declaration that it may lawfully terminate (1) the Chevrolet Dealer Sales and Service Agreement between GM and Defendant, Englewood Auto Group LLC ("EAG"), as supplemented by the parties' Participation Agreement dated June 1, 2009, and (2) the Buick GMC Dealer Sales and Service Agreement between GM and EAG, as supplemented by the parties' Participation

A/75634078.1

Agreement dated October 21, 2009 (collectively, the "Dealer Agreements"). As set forth below, GM notified EAG that it intends to terminate the Dealer Agreements effective October 28, 2013, due to EAG's failure to substantially comply with material provisions of the Dealer Agreements. Specifically, EAG has consistently failed to meet GM's reasonable sales performance standards despite notice and an opportunity to cure its defaults.

GM further seeks a declaration that it lawfully denied EAG's March 14, 2013 proposal to relocate its Buick GMC operations and consolidate them with its Chevrolet operations (the "Relocation Proposal"). GM denied the Relocation Proposal because it does not meet GM's reasonable facility size and brand alignment requirements. EAG justified the Relocation Proposal by claiming that it would allow EAG to reduce expenses, but in fact the Proposal is not financially prudent.

## PARTIES

1. Plaintiff General Motors LLC is a Delaware limited liability company with a principal place of business at 300 Renaissance Center, Detroit, Michigan 48265. General Motors LLC's sole member is General Motors Holdings LLC, a Delaware limited liability company with a principal place of business in the State of Michigan. In turn, General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with a principal place of business in the State of Michigan.

2. Defendant Englewood Auto Group, LLC is a New Jersey limited liability company with a principal place of business at 386 Grand Avenue, Englewood, New Jersey 07631.

## JURISDICTION

3. This is an action for declaratory judgment in a case of actual controversy pursuant to 28 U.S.C. §2201 and is brought pursuant to Rule 57 of the Federal Rules of Civil Procedure to determine the respective rights and liabilities of the parties under the Dealer Agreements, the Automobile Dealers' Day in Court Act, 15 U.S.C. §§1221 *et seq.* ("ADDCA"), and the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

4. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, because plaintiff and defendant are residents of different states and the amount in controversy exceeds $75,000.

5. The Court also has federal question jurisdiction pursuant to 28 U.S.C. §1331 because this case arises under the ADDCA pursuant to 15 U.S.C. §§1221 *et seq.* The Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. §1367.

## FACTUAL ALLEGATIONS

### Old GM's Bankruptcy

6. The U.S. financial markets collapsed from a liquidity crisis in 2008 and General Motors Corporation ("Old GM") faced a significant financial crisis, as it needed funding just to meet its short term obligations. Without credit, Old GM's alternative was liquidation, which would have had "appalling consequences for its creditors, its employees and our nation." *In re Gen. Motors Corp.*, 2009 U.S. Dist. Lexis 61279, at *1 (S.D.N.Y. July 9, 2009).

7. Old GM filed a voluntary petition for bankruptcy relief on June 1, 2009 in the United States District Court for the Southern District of New York (the "Bankruptcy Court"). As part of the bankruptcy proceedings, the Bankruptcy Court approved the sale of certain assets of

Old GM to a new company, now known as General Motors LLC or "New GM", the Plaintiff in this action.

8. For many years prior to filing for bankruptcy, Old GM had been attempting to restructure and right-size itself and its dealer network to allow it to compete on a more equal footing with its foreign competitors. During the bankruptcy proceeding, both the federal government, which financed the restructuring, and the Bankruptcy Court correctly noted that Old GM's dealer network was bloated, often poorly located and included many underperforming dealers.

9. The U.S. Treasury Department's Auto Task Force also urged GM to substantially reduce the size of its dealer network, even rejecting GM's initial efforts to trim the number of dealers as not aggressive enough.

10. To obtain federal financing, GM was required to submit a plan that, among other things, significantly reduced the size of its dealer network. A reduction in the number of GM dealers would allow the remaining dealers to increase sales, become more profitable, improve dealership facilities and locations, and reduce the financial support needed from GM. All of this would improve the financial outlook for GM, its dealers, its suppliers, and the communities they serve.

11. GM's right sizing efforts were painful for many - employees, suppliers, dealers and communities. As part of GM's efforts to reduce, right-size and properly locate its dealer network, Old GM used an objective process to determine which dealers would be retained as part of New GM.

12. Old GM offered Participation Agreements to those dealers that met the criteria to be retained. Dealers who did not receive Participation Agreements were offered Wind-Down

Agreements whereby GM would provide cash payments for dealers to wind-down their operations until their Dealer Agreements expired on October 31, 2010.

13. After notice to all interested parties and a lengthy evidentiary hearing, the Bankruptcy Court entered an order approving the sale of certain assets of Old GM to New GM. As part of this sale, Old GM's existing Dealer Agreements, as supplemented by the Participation Agreements and the Wind-Down Agreements, were assigned to New GM.

**GM's Standard Dealer Sales and Service Agreement**

14. GM's contractual relationship with each of its authorized dealers is set forth in a Dealer Sales and Service Agreement that incorporates a set of Standard Provisions. A true and accurate copy of the Standard Provisions is attached hereto as <u>Exhibit A</u>.

15. The express "Purpose of [the Dealer] Agreement," as set forth on page 1 of the Standard Provisions, is as follows:

> General Motors has established a network of authorized dealers operating at approved locations to effectively sell and service its Products and to build and maintain consumer confidence and satisfaction in Dealer and General Motors.

16. In order to determine whether a dealer is meeting its obligation to effectively sell automobiles, GM, like all automobile manufacturers, evaluates the dealers based on the expected sales in their assigned area of primary responsibility ("APR"). In metropolitan areas such as Englewood, New Jersey, the same APR is assigned to two or more same line-make dealers on a shared basis. This type of APR is known as a Multiple Dealer Area ("MDA"). MDAs are then subdivided into Areas of Geographic Sales and Service Advantage ("AGSSA"), in which one same line-make dealer in the MDA is located. An AGSSA represents an area in which the dealer enjoys a competitive advantage over all other same-line dealers due to geographic factors.

17. The sales effectiveness of an individual dealer is measured by the number of actual same-line automobile sales it makes to customers anywhere in the U.S. ("actual sales") compared to the number of expected retail registrations in the dealer's AGSSA, calculated by vehicle segment to account for socioeconomic and other factors that may affect a population's transportation needs and preferences ("expected sales"). This ratio of dealer's actual sales to the expected sales is expressed as a percentage, and constitutes that dealer's Retail Sales Index or RSI. When a dealer's sales effectiveness or RSI equals 100, its performance is considered average.

18. Article 9 of the Standard Provisions sets forth the minimum RSI a dealer must achieve in order be in compliance therewith:

> Satisfactory performance of Dealer's sales obligations under Article 5.1 <u>requires Dealer to achieve a Retail Sales Index equal or greater than 100</u>. (Emphasis added).

19. Article 13.2 of the Standard Provisions addresses a dealer's material breach of its sales performance obligations:

> If General Motors determines that Dealer's Premises are not acceptable, or that Dealer has failed to adequately perform its sales and service responsibilities, including those responsibilities related to customer satisfaction and training, General Motors will review such failure with Dealer.
>
> As soon as practical thereafter, General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during which Dealer will have the opportunity to correct the failure.
>
> If the Dealer does correct the failure by the expiration of the period, General Motors will so advise the Dealer in writing. If, however, the Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice.

A/75634078.1

20.     Article 4.4 of the Standard Provisions addresses the size, location, image and design of a dealer's facilities and premises. In Article 4.4.3 of the Standard Provisions, Dealer agrees that its facilities will be sized in accordance with GM's requirements for that location and provides that GM will establish and maintain a written policy for determining reasonable dealer facility space requirements. Article 4.4.4 addresses the dealership image and design and provides that facilities will comply with the reasonable requirements that GM may establish to promote and preserve the image of GM and its dealers.

21.     If a dealer wants to make a change in its location or premises, or in the uses previously approved for those premises:

> Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises . . . will be made without General Motors prior written authorization pursuant to its business judgment.

Standard Provisions, Article 4.4.2.

**EAG's Breach of the Buick GMC Dealer Agreement and Participation Agreement**

22.     Since January 11, 2002, EAG has been an authorized dealer of Buick and GMC automobiles and products under successive written Dealer Sales and Service Agreements. A true and correct copy of the most recent Dealer Agreement between GM and EAG for Buick GMC dated November 1, 2010 (the "Buick GMC Dealer Agreement") is attached hereto as Exhibit B.

23.     When Old GM declared bankruptcy in 2009, it evaluated the sales effectiveness or RSI of all its dealers. Keeping in mind that a 100 RSI is average, EAG's Buick GMC sales performance was as follows:

| Brand | RSI 2007 | RSI 2008 |
|---|---|---|
| Buick | 36.2 | 53.7 |
| GMC | 65.9 | 51.2 |
| Consolidated Buick GMC | 53.4 | 52.2 |

7

24.     Based on this poor sales performance, Old GM initially issued a Wind-Down Agreement to EAG for Buick GMC. On or about June 1, 2009, after consulting with counsel, EAG executed the Wind-Down Agreement for its Buick GMC operations, a true and correct copy of which is attached hereto as <u>Exhibit C</u>. Pursuant to the Wind-Down Agreement, EAG would have received a cash payment for Buick GMC, seventeen (17) months to continue as a GM dealer so it could sell its inventory while continuing other dealership operations, and time to either wind down its affairs in an orderly manner or transition to other business opportunities.

25.     EAG then approached GM and asked to be given another chance to continue operating as a Buick GMC dealer. GM ultimately agreed.

26.     On October 26, 2009, after consulting with counsel, EAG executed a Participation Agreement with GM, allowing EAG to continue as a Buick GMC dealer <u>provided it reach certain minimum performance goals</u> (the "Buick GMC Participation Agreement"). A true and correct copy of the Buick GMC Participation Agreement is attached hereto as <u>Exhibit D</u>. In the Buick GMC Participation Agreement, EAG agreed to obtain a Retail Sales Index ("RSI") equal to or greater than "(i) seventy (70) for the calendar year 2010; (ii) eight-five (85) for the calendar year 2011; and (iii) one hundred (100) for the calendar year 2012."

27.     EAG further agreed that "Dealer's failure to achieve the RSI required in the previous sentence for any of the Existing Model Lines for any of the calendar years identified shall constitute a default under the terms of this letter agreement." Exh. C, ¶9(a).

28.     It was only on the condition that EAG improve its sales performance and meet these specific requirements that GM agreed to offer EAG the Buick GMC Participation Agreement.

29. GM provided various assistance to EAG in an effort to help it meet its performance requirements under the Buick GMC Participation Agreement. First, GM waived EAG's 2010 performance requirements. Second, GM instituted a program to help dealers like EAG improve their operations. This program involved GM's Zone Manager meeting quarterly with EAG, providing business counseling, and encouraging development of a business plan, action plans and marketing plans. GM also performed a quarterly review with EAG to assess its progress toward its sales requirements and discuss ways in which GM might assist EAG in meeting those requirements. Third, GM offered EAG additional vehicle allocation to support increased sales.

30. Despite GM's efforts and support, EAG did not meet or even approach meeting its 2011 contractual RSI requirements. Due to the elimination of certain surrounding dealers as a result of Old GM's bankruptcy proceeding, GM proposed to increase the size of EAG's AGSSA to reflect the larger area in which it now had a geographic sales and service advantage over other Buick GMC dealers and the increased sales opportunities available to it. In assessing EAG's performance under the Participation Agreement, however, GM agreed to use EAG's smaller 2008 AGSSA, which had the effect of lowering EAG's expected sales and inflating its RSI. Even utilizing the smaller 2008 AGSSA, EAG's 2011 RSI was only 70.4 for Buick and 70.2 for GMC, resulting in a cumulative RSI of only 70.3, which constituted a breach of the Buick GMC Participation Agreement and the Buick GMC Dealer Agreement.[1] Moreover, EAG had one of the lowest sales performances of any Buick GMC dealer in New Jersey.

31. GM notified EAG by letter dated June 5, 2012 of its default and provided EAG with a six month opportunity for EAG to correct its performance deficiencies in accordance with

---

[1] EAG's RSI for Buick GMC in 2011, using its increased AGSSA, was 60.32 for Buick and 42.9 for GMC, for a cumulative RSI of 51.6.

Article 13.2 of the Dealer Agreement and as may be required by New Jersey law. In order to accommodate the six month cure period, GM also agreed to extend the expiration of the Dealer Agreement from April 30, 2012 until March 31, 2013. A true and correct copy of the Notice of Default of the Buick GMC Dealer Agreement is attached hereto as <u>Exhibit E</u>.

32.  However, despite GM's notice of breach and opportunity to cure, EAG's 2012 RSI (even using the smaller 2008 AGSSA) fell significantly to 58.5 for Buick and 59.6 for GMC, for a cumulative RSI of 59.1.[2] Even during the six month cure period while EAG was under a notice of breach, its RSI was only 55.7 for Buick and 62.1 for GMC, for a cumulative RSI of 58.9. Again, all these scores are well below the agreed standard.

33.  On August 2, 2013, GM delivered a written notice to EAG stating GM's intent to terminate the Buick GMC Dealer Agreement, and setting forth the reasons therein (the "Buick GMC Notice of Termination"), a true and correct copy of which is attached hereto as <u>Exhibit F</u>.

34.  In light of EAG's material breaches of the Buick GMC Dealer Agreement and the Buick GMC Participation Agreement, and failure to cure such breaches, termination is authorized by Article 13 of the Standard Provisions to the Buick GMC Dealer Agreement.

35.  Because of EAG's failure substantially to comply with the Buick GMC Dealer Agreement and the Buick GMC Participation Agreement, GM has good cause to terminate the Buick GMC Dealer Agreement under New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

36.  GM has acted toward EAG in good faith, as defined by 15 U.S.C. §1221(e), in terminating the Buick GMC Dealer Agreement.

---

[2]  EAG's RSI for Buick GMC in 2012, using its increased AGSSA, was 51.1 for Buick and 36.7 for GMC, for a cumulative RSI of 42.5.

A/75634078.1

37. EAG disputes GM's right to terminate the Buick GMC Dealer Agreement. For that reason, there is an actual controversy between the parties which an action for declaratory judgment is an appropriate means to resolve.

**EAG's Breach of the Chevrolet Dealer Agreement and Participation Agreement**

38. Since January 4, 1999, EAG has been an authorized dealer of Chevrolet automobiles and products under successive written Dealer Sales and Service Agreements. A true and correct copy of the most recent Dealer Agreement between GM and EAG for Chevrolet, dated November 1, 2010 (the "Chevrolet Dealer Agreement"), is attached hereto as Exhibit B.[3]

39. When evaluated by GM in 2009, EAG's Chevrolet sales performance was extremely poor:

| BRAND | RSI 2007 | RSI 2008 |
|---|---|---|
| Chevrolet | 58.7 | 47.3 |

40. Despite this poor sales performance, Old GM decided to maintain Chevrolet representation at this location and offered EAG a Participation Agreement. On or about June 10, 2009, after consulting with counsel, EAG executed a Participation Agreement for its Chevrolet operations (the "Chevrolet Participation Agreement"), a true and correct copy of which is attached hereto as Exhibit G. In the Chevrolet Participation Agreement, EAG agreed that it "must substantially increase its sales of new Motor Vehicles." Exh. B, ¶2.

41. Although EAG agreed, pursuant to the Chevrolet Participation Agreement, to substantially increase its sales of new motor vehicles, EAG failed to do so. For 2011, EAG's RSI for Chevrolet was only 46.1, which was a breach of both the Dealer Agreement and the Chevrolet Participation Agreement. Moreover, EAG had one of the lowest sales performances of any Chevrolet dealer in New Jersey.

---

[3] The November 1, 2010 Dealer Agreements between GM and EAG for both the Buick GMC dealership and the Chevrolet dealership together comprise a one-page document, which is Exhibit B.

11

42. GM notified EAG by letter dated June 5, 2012 of its default and provided a six month opportunity for it to correct its performance deficiencies in accordance with Article 13.2 of the Standard Provisions and as may be required by New Jersey law. In order to accommodate the six month cure period, GM also agreed to extend the expiration of the Chevrolet Dealer Agreement from April 30, 2012 until March 31, 2013. A true and correct copy of the Notice of Default of the Chevrolet Dealer Agreement is attached hereto as Exhibit H.

43. Despite GM's notice of breach and opportunity to cure, EAG's RSI for calendar year 2012 dropped even further to 42.17. Even during the six month cure period while EAG was under a notice of breach, its RSI was only 48.0, well below the agreed upon standard.

44. On August 2, 2013, GM delivered a written notice to EAG stating GM's intent to terminate the Chevrolet Dealer Agreement, and setting forth the reasons therein (the "Chevrolet Notice of Termination"). A true and correct copy of the Chevrolet Notice of Termination is attached hereto as Exhibit I.

45. In light of EAG's material breaches of the Chevrolet Dealer Agreement and the Chevrolet Participation Agreement, and failure to cure such breaches, termination is authorized by Article 13 of the Chevrolet Dealer Agreement.

46. Because of EAG's failure substantially to comply with the Chevrolet Dealer Agreement and the Chevrolet Participation Agreement, GM has good cause to terminate the Chevrolet Dealer Agreement under New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

47. GM has acted toward EAG in good faith, as defined by 15 U.S.C. §1221(e), in terminating the Chevrolet Dealer Agreement.

48.   EAG disputes GM's right to terminate the Chevrolet Dealer Agreement. For that reason, there is an actual controversy between the parties which an action for declaratory judgment is an appropriate means to resolve.

**EAG's Relocation and Consolidation Proposal**

49.   During 2013, EAG submitted the Relocation Proposal to GM for its approval. Specifically, EAG proposed relocating its Buick and GMC sales operations, currently located at 406 Grand Avenue, Englewood, New Jersey, and consolidating them with EAG's Chevrolet sales and service operations that are currently located at 386 Grand Avenue, Englewood New Jersey.

50.   Pursuant to the Standard Provisions, EAG may not relocate or change the use of its premises without the prior written approval from GM.

51.   Under New Jersey law, GM may deny the Relocation Proposal if it does not substantially satisfy GM's reasonable standards for its dealers' facilities. N.J. Ann. Stat. §§56:10-1 *et seq.*

52.   On August 2, 2013, GM delivered to EAG a notice of rejection of its Relocation Proposal (the "Notice of Rejection"), a true and correct copy of which is attached hereto as Exhibit J. As set forth in the Notice of Rejection, the bases for denial by GM are: (a) the Relocation Proposal does not meet GM's reasonable facility size standards for GM dealers; and (b) the Relocation Proposal does not meet GM's reasonable facility standards for brand alignment in Englewood, New Jersey. The Relocation Proposal is also not financially prudent for EAG despite its expressed desire to reduce expenses.

53.   Because EAG's Relocation Proposal does not meet GM's reasonable facility standards, denial of the Proposal is authorized by the Dealer Agreements and the New Jersey

Franchise Practices Act. N.J. Ann. Stat. §§56:10-1 *et seq.* Moreover, GM had acted in good faith, as defined by 15 U.S.C. §1221(e), in denying the Relocation Proposal.

54. EAG disputes GM's right to deny the Relocation Proposal. For that reason, there is an actual controversy between the parties which an action for declaratory judgment is an appropriate means to resolve.

### Count I
### DECLARATORY RELIEF
### Declaration That Termination Will Not Breach The Buick GMC Dealer Agreement

55. Plaintiff realleges and incorporates the allegations of paragraphs 1-54 above, as if set forth fully herein.

56. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM's noticed termination of the Buick GMC Dealer Agreement constitutes a breach of any of the provisions thereof.

### Count II
### DECLARATORY RELIEF
### Declaration That Termination Of Buick GMC Dealer Agreement Will Not Create Liability Under 15 U.S.C. §§1221-1222

57. Plaintiff realleges and incorporates the allegations of paragraphs 1-56 above, as if set forth fully herein.

58. GM has acted toward EAG in good faith, as defined by 15 U.S.C. §1221(e), in terminating the Buick GMC Dealer Agreement.

59. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may terminate the Buick GMC Dealer Agreement without liability under 15 U.S.C. §§1221-1222.

A/75634078.1

**Count III**
**DECLARATORY RELIEF**
**Declaration That Termination Of Buick GMC Dealer Agreement Will Not Create Liability Under N.J. Stat. Ann. §§56:10-1 *et seq.***

60.   Plaintiff realleges and incorporates the allegations of paragraphs 1-59 above, as if set forth fully herein.

61.   GM has good cause to terminate the Buick GMC Dealer Agreement under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

62.   GM has complied with the notice provisions of N.J. Stat. Ann. §56:10-5.

63.   Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may terminate the Buick GMC Dealer Agreement without liability under N.J. Stat. Ann. §§56:10-1 *et seq.*

**Count IV**
**DECLARATORY RELIEF**
**Declaration That Termination Will Not Breach The Chevrolet Dealer Agreement**

64.   Plaintiff realleges and incorporates the allegations of paragraphs 1-63 above, as if set forth fully herein.

65.   Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM's noticed termination of the Chevrolet Dealer Agreement constitutes a breach of any of the provisions thereof.

**Count V**
**DECLARATORY RELIEF**
**Declaration That Termination Of Chevrolet Dealer Agreement Will Not Create Liability Under 15 U.S.C. §§1221-1222**

66.   Plaintiff realleges and incorporates the allegations of paragraphs 1-65 above, as if set forth fully herein.

67. GM has acted toward EAG in good faith, as defined by 15 U.S.C. §1221(e), in terminating the Chevrolet Dealer Agreement.

68. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may terminate the Chevrolet Dealer Agreement without liability under 15 U.S.C. §§1221-1222.

## Count VI
## DECLARATORY RELIEF
### Declaration That Termination Of Chevrolet Dealer Agreement Will Not Create Liability Under N.J. Stat. Ann. §§56:10-1 *et seq.*

69. Plaintiff realleges and incorporates the allegations of paragraphs 1-68 above, as if set forth fully herein.

70. GM has good cause to terminate the Chevrolet Dealer Agreement under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

71. GM has complied with the notice provisions of N.J. Stat. Ann. §56:10-5.

72. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may terminate the Chevrolet Dealer Agreement without liability under N.J. Stat. Ann. §§56:10-1 *et seq.*

## Count VII
## DECLARATORY RELIEF
### Declaration That Denial of Relocation Proposal Will Not Breach The Dealer Agreements

73. Plaintiff realleges and incorporates the allegations of paragraphs 1-72 above, as if set forth fully herein.

74. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM's denial of EAG's Relocation Proposal constitutes a breach of any of the provisions of the Dealer Agreements.

A/75634078.1

## Count VIII
## DECLARATORY RELIEF
### Declaration That Denial of Relocation Proposal Will Not Create Liability Under 15 U.S.C. §§1221-1222

75. Plaintiff realleges and incorporates the allegations of paragraphs 1-74 above, as if set forth fully herein.

76. GM has acted toward EAG in good faith, as defined by 15 U.S.C. §1221(e), in denying EAG's Relocation Proposal.

77. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may deny the Relocation Proposal without liability under 15 U.S.C. §§1221-1222.

## Count IX
## DECLARATORY RELIEF
### Declaration That Denial of Relocation Proposal Will Not Create Liability Under N.J. Stat. Ann. §§56:10-1 *et seq.*

78. Plaintiff realleges and incorporates the allegations of paragraphs 1-77 above, as if set forth fully herein.

79. The Relocation Proposal does not substantially satisfy GM's reasonable facilities standards and therefore GM has good cause to deny the Proposal under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*

80. Based on all of the preceding allegations, a present controversy exists between plaintiff and defendant as to whether GM may deny the Relocation Proposal without liability under N.J. Stat. Ann. §§56:10-1 *et seq.*

**WHEREFORE**, GM respectfully requests an Order, pursuant to 28 U.S.C. §2201, ruling as follows:

(a) GM may lawfully terminate the parties' Buick GMC Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability for breach thereof;

(b) GM may lawfully terminate the parties' Buick GMC Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability under 15 U.S.C. §§1221-1222;

(c) GM may lawfully terminate the parties' Buick GMC Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*;

(d) GM may lawfully terminate the parties' Chevrolet Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability for breach thereof;

(e) GM may lawfully terminate the parties' Chevrolet Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability under 15 U.S.C. §§1221-1222;

(f) GM may lawfully terminate the parties' Chevrolet Dealer Agreement in accordance with the Notice of Termination dated August 2, 2013, without liability under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*;

(g) GM may lawfully deny EAG's Relocation Proposal pursuant to the Notice of Rejection, without liability for breach of the Dealer Agreements;

(h) GM may lawfully deny EAG's Relocation Proposal pursuant to the Notice of Rejection, without liability under 15 U.S.C. §§1221-1222;

(i)     GM may lawfully deny EAG's Relocation Proposal pursuant to the Notice of Rejection, without liability under the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§56:10-1 *et seq.*; and

(j)     awarding GM such other and further relief as the Court deems just.

August 2, 2013                                         GENERAL MOTORS LLC

                                                By: s/ Jessica Boar Del Cid
                                                    Jessica Boar Del Cid (JB5755)
                                                    jessica.boar@bingham.com
                                                    Diane C. Hertz
                                                    diane.hertz@bingham.com
                                                    **Bingham McCutchen LLP**
                                                    399 Park Avenue
                                                    New York, NY 10022
                                                    Tel.  212-705-7000

                                                    James C. McGrath
                                                    james.mcgrath@bingham.com
                                                    **Bingham McCutchen LLP**
                                                    One Federal Street
                                                    Boston, MA  02110
                                                    Tel. 617-951-8000

                                                    *Attorneys for Plaintiff, General Motors LLC*

*Of Counsel*

Paul J. Widzinski
General Motors LLC
Mail Code:  482-026-601
P.O. Box 400
Detroit, Michigan  48265-4000

19

A/75634078.1