UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GENERAL MOTORS LLC**, | Civ. No. 2:13-cv-04666 (WJM) |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **OPINION** |
| **ENGLEWOOD AUTO GROUP, LLC**, | |
| Defendant/Counterclaimant, | |
| v. | |
| **ARGONAUT HOLDINGS, INC.**, | |
| Counterclaim-Defendant. | |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiff General Motors LLC ("GM") brings this breach of contract action against Defendant Englewood Auto Group, LLC ("EAG"), seeking a declaration that it may lawfully terminate its franchise agreements with EAG. In response, EAG filed Counterclaims against GM and GM's affiliate, Argonaut Holdings, Inc. ("Argonaut"). This matter comes before the Court on (1) GM's motion to dismiss Counts IV, V, VIII, and X of EAG's Counterclaims under Federal Rule of Civil Procedure 12(b)(6), (2) Argonaut's motion to dismiss all Counterclaims against it under Rule 12(b)(6), and (3) EAG's cross-motion for leave to file amended counterclaims. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court **GRANTS** the three pending motions.

    **I.**    **BACKGROUND**

GM manufactures and distributes motor vehicles and related products under various brand names through a network of authorized dealers. This case arises from GM's decision to end its contractual relationship with one of its authorized dealers, EAG. Since 1999, EAG has been an authorized dealer of Chevrolet automobiles and products under successive Dealer Sales and Service Agreements (the "Chevrolet Dealer

1

Agreement"). Def.'s Countercls. ¶ 9. And since 2002, EAG has also been an authorized dealer of Buick and GMC automobiles and products under successive Dealer Sales and Services Agreements (the "Buick GMC Dealer Agreement" and, together with the Chevrolet Dealer Agreement, the "Dealer Agreements"). Def.'s Countercls. ¶ 11. EAG operates both its Chevrolet dealership and its Buick GMC dealership in Englewood, New Jersey. Def.'s Countercls. ¶¶ 9, 11. EAG sublets the Buick GMC dealership facility from Argonaut under a dealer sublease (as amended, the "Sublease").

Prior to its bankruptcy in 2009, GM was known as General Motors Corporation ("Old GM"). Def.'s Countercls. ¶ 10. In connection with its acquisition of the Buick GMC Dealership in 2002, EAG entered into an Agreement and Business Plan, dated January 2, 2002, with Old GM (the "Business Plan Agreement"). The Business Plan Agreement included provisions regarding EAG's assumption of the Sublease. The Business Plan Agreement also contemplates EAG eventually receiving the right to operate a Pontiac franchise at its Buick GMC Dealership facility. Under the Business Plan Agreement, Old GM agreed to provide a subsidy of twenty-eight percent (28%) of the basic rent for the Buick GMC Facility until it was able to appoint EAG as a Pontiac franchisee (the "Pontiac Rent Subsidy").[1] Decl. of Diane C. Hertz filed in Support of GM's Mot. to Dismiss ("Hertz GM Decl.") Ex. B ¶ 12, ECF No. 32.

In 2004, Old GM secured the rights to grant EAG a Pontiac franchise. In connection with EAG's acquisition of the Pontiac franchise, the parties amended both the Business Plan Agreement (the "Business Plan Amendment") and the Sublease. The Business Plan Amendment provides that the Pontiac Rent Subsidy would sunset on December 31, 2004. [2] Hertz GM Decl. Ex. C ¶ 4.

On June 1, 2009, Old GM filed for bankruptcy. In connection with that bankruptcy filing, Old GM discontinued the Pontiac brand. Def.'s Contercls. ¶ 94. Also in connection with the bankruptcy, GM and EAG entered into two Participation Agreements, one for the Chevrolet Dealer Agreement and the other for the Buick GMC Dealer Agreement (the "Participation Agreements"). *Id.* ¶¶ 11, 12. The Participation Agreements allowed EAG to continue acting as a Chevrolet and Buick GMC dealer following the bankruptcy. *Id.*

The Participation Agreements contain a sales performance requirement, called the Retail Sales Index ("RSI"). Def.'s Countercls. ¶ 14. GM claims that EAG failed to meet the required RSIs at both its Chevrolet and GMC Buick dealerships for several years.

---

[1] Section 12 of the Business Plan Agreement provides that ". . . GM shall provide a subsidy of twenty-eight percent (28%) of Basic Rent (as defined in the Dealership Sublease) per month against Basic Rent each month until GM and Dealer enter into the Pontiac Dealer Agreement."

[2] Section 4 of the Business Plan Amendment, which amends Section 12 of the Business Plan Agreement, provides that ". . . GM shall provide a subsidy of twenty-eight percent (28%) of Basic Rent (as defined in the Dealer Sublease) of Basic Rent (as defined in the Dealership Sublease) per month against Basic Rent each month until December 31, 2004."

Def.'s Countercls. ¶¶ 16-19. Accordingly, on August 2, 2013, GM filed the Complaint, seeking a declaration that it may lawfully terminate its contractual relationship with EAG. In response, EAG filed the Counterclaims against GM and Argonaut, alleging violations of the New Jersey Franchise Practices Act, breach of contract, unjust enrichment, reformation based on mistake, and breach of the implied covenant of good faith and fair dealing. GM and Argonaut both move to dismiss several of EAG's Counterclaims. EAG cross-moves for leave to amend the Counterclaims.

## II. GM'S AND ARGONAUT'S MOTIONS TO DISMISS

The instant motion involves the following Counterclaims:

(1) Count IV: Breach of the Dealer Agreements for Allowing Brokered Sales against GM;
(2) Count V: Unjust Enrichment against GM and Argonaut;
(3) Count VI: Breach of the Sublease against Argonaut;
(4) Count VII: Reformation of the Sublease against Argonaut and GM;
(5) Count VIII: Breach of the Dealer Agreements for Denial of Saturn Warranty Work against GM;
(6) Count X[3]: Breach of the Implied Covenant of Good Faith and Fair Dealing against GM.

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

---
[3] Incorrectly labeled "Count XI."

*Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* In deciding a motion to dismiss under Rule 12(b)(6), the court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of the plaintiff's claim. *Lum. v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

### B. Breach of Dealer Agreements (Counts IV and VIII)

The Counterclaims allege that GM has breached the Dealer Agreements and, in doing so, has contributed to EAG's inability to meet the RSIs. EAG maintains that GM has breached the Dealer Agreements in two ways. The first involves EAG's contractual obligation, under the Dealer Agreements, to not sell GM vehicles to or through brokers to end users. EAG argues the Dealer Agreements also impose an obligation on GM to prevent other dealers from engaging in brokered sales, and that GM has failed to do so. The second involves GM's allocation of warranty work for its Saturn brand. In connection with its restructuring in 2009, GM discontinued the Saturn brand and closed its Saturn dealerships. Def.'s Countercls. ¶ 42. GM then made determinations as to which dealers of other GM brands would be permitted to perform warranty work on Saturn vehicles. *Id.* ¶ 42. GM did not grant EAG the opportunity to perform Saturn warranty work. *Id.* ¶ 45. EAG maintains that GM's failure to provide EAG with Saturn warranty work constitutes a breach of the Dealer Agreements.

The parties agree that Michigan law applies to all claims arising under the Dealer Agreements. GM argues that the Court should dismiss Counts IV and VIII, because the Dealer Agreements neither require GM to prevent brokered sales nor obligate GM to provide EAG with Saturn warranty work. The Court agrees and will dismiss both claims.

### i. Brokered Sales (Count IV)

In Count IV, EAG alleges that GM has breached the Dealer Agreements by failing to ensure that third-party dealers comply with the obligations not to sell GM vehicles to or through brokers to end users. Def.'s Countercls. ¶ 86. The primary provision concerning brokered sales is Section 5.1.4 of GM's Standard Provisions, which are incorporated into each Dealer Agreement. Section 5.1.4 provides that:

> [U]nless otherwise authorized in writing, Dealer agrees to purchase Motor Vehicles only for resale to customers for personal use or primary business use other than resale. Dealer is not authorized by this Agreement to directly or indirectly sell Motor Vehicles to persons or parties (or their agents) engaged in the business of reselling, brokering (including but not limited to buying services) or wholesaling of Motor Vehicles.

Hertz GM Decl. Ex. A ¶ 5.1.4.  The Counterclaims also reference the "Purpose of Agreement" section at the beginning of the Standard Provisions, which notes that the mutual dependence of between General Motors and its dealers "requires a spirit of cooperation, trust and confidence."  Def.'s Countercls. ¶ 35.  And EAG cites to Section 4.1, which states that "dealers must be appropriate in number, located properly, and have proper facilities . . . to permit each dealer the opportunity to achieve a reasonable return on investment . . . ."  Def.'s Countercls. ¶ 35; Hertz GM Decl. Ex. A ¶ 4.1.  Section 4.1 further states that "[t]o maximize the effectiveness of its dealer network, General Motors agrees to monitor market conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location."  Hertz GM Decl. Ex. A ¶ 4.1.  EAG also refers to Section 4.2, which provides that each dealer is responsible for effectively selling, servicing, and otherwise representing GM products in its Area of Primary Responsibility.  Hertz GM Decl. Ex. A ¶ 4.2.  Finally, EAG cites to Section 6.1, which states that GM "will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner."  Hertz GM Decl. Ex. A ¶ 6.1.

EAG bases this breach of contract claim on two theories:  (1) that GM breached its direct obligations to EAG under the Dealer Agreements by failing to prevent brokered sales, and (2) that EAG is a third-party beneficiary of GM's dealer agreements with its other dealers, and can recover for GM's failure to enforce the brokered sale prohibition in those agreements.

### 1. Breach of Contract Claim

EAG first argues that GM breached its direct obligations to EAG under the Dealer Agreements by failing to prevent brokered sales.  To state a claim for breach of contract in Michigan, a plaintiff must allege: (1) the existence of a valid contract between the parties, (2) the terms of the contract; (3) that defendant breached the terms of the contract, and (4) that the defendant's breach caused the injury to the plaintiff.  *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999).  Here, much of the language that EAG cites in support of its claim is general and aspirational, and does not place any specific obligation upon GM.  *See Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-cv-679, 2009 WL 3327242, at *3 n.3 (W.D. Mich. Oct. 13, 2009) (finding language stating that the parties "intend to work cooperatively to develop improved items" was "merely a general and aspirational statement of cooperation rather than a specific obligation"); *Hubbard Auto Ctr., Inc. v. Gen. Motors Corp.*, No. 4:05-cv-41, 2008 WL 3874642, at *7 (N.D. Ind. Aug. 14, 2008) ("[T]he phrase 'achieve a reasonable return on investment' does not impose any contractual duty on GM to permit each dealer the opportunity to achieve a reasonable return on investment; rather, that phrase is merely aspirational language.").  Moreover, nothing in the Dealer Agreements obligates GM to prevent, or even prohibits GM from permitting, brokered transactions.  In fact, Section 5.1.4 expressly acknowledges the possibility of a dealer receiving written authorization to

5

engage in brokered transactions. EAG thus has failed to allege a direct breach of the Dealer Agreements.

### 2. Third-Party Beneficiary Claim

EAG also argues that it is a third-party beneficiary of GM's dealer agreements with other dealers, and that GM has breached its obligations to it by allowing those dealers to breach those agreements. Specifically, EAG argues that EAG is third-party beneficiary of GM's obligations to police its dealer network and fairly allocate vehicles, which EAG alleges includes enforcing the prohibition against brokered sales.

A person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise directly to or for that person. Mich. Comp. Laws § 600.1405; *Koenig v. South Haven*, 597 N.W.2d 99, 104 (Mich. 1999). Courts use an objective standard to determine, from the form and meaning of the contract itself, whether the promisor undertook to give or to do or to refrain from doing something directly to or for the person claiming third-party beneficiary status. *Schmalfeldt v. N. Pointe Ins. Co.*, 670 N.W.2d 651, 654 (Mich. 2003).

EAG fails to allege that GM has breached any obligation to it as a third-party beneficiary. As stated previously, nothing in the Dealer Agreements imposes any duty or obligation on GM to prevent, or prohibits GM from permitting, brokered sales. Moreover, the Standard Provisions expressly preclude enforcement by third-party beneficiaries. *See* Hertz GM Decl. Ex. A ¶ 17.9 ("This Agreement is not enforceable by any third parties and is not intended to convey any rights or benefits to anyone who is not a party to this Agreement."). The Court will thus dismiss Count IV.

### ii. Saturn Warranty Work (Count XIII)

In Count VIII, EAG alleges that GM has breached the Dealer Agreements by denying to EAG the opportunity to perform warranty work on Saturn vehicles following its decision to discontinue the Saturn brand and close the Saturn dealerships located near EAG. Def.'s Countercls. ¶ 112. Specifically, EAG alleges that GM has breached its obligations "to act in a spirit of cooperation, trust and confidence with its dealers and its representations that each dealer would be permitted the opportunity to achieve a reasonable return on investment if it fulfills the obligations under its Dealer Agreement." *Id.*

Defendant moves to dismiss Count VIII, arguing that the Dealer Agreements do not grant EAG the right to act as a Saturn warranty center. The Court agrees. Moreover, Plaintiff did not respond to this argument in its opposition and thus has waived this Count. *See Rondigo, LLC v. Twp. of Richmond, Mich.,* No. 12–1515, 2013 WL 1271668, at *2 (6th Cir. Mar. 28, 2013); *Duran v. Equifirst Corp.*, No. 2:09-CV-03856, 2010 WL 936199, at *3 (D.N.J. Mar. 12, 2010) ("The absence of argument constitutes waiver in

regard to the issue left unaddressed, and that waives the individual counts themselves"); *Griglak v. CTX Mortgage Co., LLC*, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count"). Accordingly, the Court will dismiss Count XIII.

### C. Unjust Enrichment (Count V)

As discussed above, the Business Plan Agreement signed in 2002 contemplated that EAG would eventually receive the right to operate a Pontiac franchise at its Buick GMC Dealership facility. Under that Agreement, Old GM agreed to pay the Pontiac Rent Subsidy until it was able to appoint EAG as a Pontiac franchisee. In 2004, Old GM secured the rights to grant EAG a Pontiac franchise. In connection with EAG's acquisition of the Pontiac franchise, the parties entered into the Business Plan Amendment to provide that the Pontiac Rent Subsidy would end on December 31, 2004.

Then, in 2009, in connection with its bankruptcy, Old GM discontinued the Pontiac brand. Def.'s Contercls. ¶ 94. Count V alleges that GM and Argonaut have "refused EAG's demands that they reinstate the Pontiac Rent Subsidy or provide other offsets to rent" due to the Pontiac brand's termination. Def.'s Countercls. ¶ 95. EAG thus argues that GM and Argonaut "have been unjustly enriched by the excessive rent paid with respect to the Premises since the discontinuation of the Pontiac brand." Def.'s Countercls. ¶¶ 97. EAG further argues that the Court should reduce the rent charged under the Sublease.

The parties agree that New Jersey law governs EAG's unjust enrichment claim. Unjust enrichment is a form of quasi-contractual liability that exists when the defendant has received a benefit from plaintiff that it would be inequitable for him to retain. *Hassler v. Sovereign Bank*, 644 F.Supp.2d 509, 519 (D.N.J. 2009). Liability under this theory is thus precluded where a valid and binding contract governs the subject matter of the claim. *Suburban Transfer Serv. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983). In such a case, the plaintiff is limited to contractual remedies. *Id.*

Here, the Business Plan Agreement and the Sublease, each as amended, clearly set forth the amount of rent due for the Buick GMC dealership facility, and the terms under which GM would pay the Pontiac Rent Subsidy. *See Bank of Am., N.A. v. Westheimer*, No. 12-7080, 2014 WL 809207 (D.N.J. Feb. 28, 2014) (dismissing an unjust enrichment claim because certain agreements governed the subject matter of the defendant's claim and all of the benefits allegedly received by the plaintiff fell within the terms of the parties' agreement). As expressly stated in the Business Plan Amendment, the Pontiac Rent Subsidy ended on December 31, 2004. And even assuming, without deciding, that we must read the Business Plan Agreement, the Sublease, and their respective amendments together as a single transaction to determine their purpose and intent, nothing in these agreements indicates that EAG would receive a rent subsidy in the event

that GM discontinued a brand.  Thus, EAG's unjust enrichment claim is precluded so long as the governing agreements are valid and binding.  *See Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982) ("[R]ecovery under unjust enrichment may not be had [under New Jersey law] when a valid, unrescinded contract governs the rights of the parties.").

EAG asserts two grounds for invalidity.  First, EAG argues that the Business Plan Amendment contains an inconsistency, rendering it ambiguous and necessitating an equitable, extra-contractual remedy.  The Court finds that the Counterclaims do not sufficiently allege any inconsistency.  In its opposition, EAG cites to Section 2 of the Business Plan Amendment, which states that "GM does not, as of the execution of this Agreement, have a right to enter into the Pontiac Dealer Agreement."  The Business Plan Amendment was executed on May 4, 2004.  EAG argues that this conflicts with Section 4 of the Business Plan Amendment, which states that "GM has entered into an agreement with the Englewood Cliffs, New Jersey Pontiac Dealer whereby such Pontiac dealer *shall terminate* its Dealer Sales and Service Agreement (emphasis added)" and that "[o]n or before May 15, 2004 . . . GM . . . and Dealer shall enter into a Dealer Sales and Service Agreement . . . for Pontiac."  These provisions are not inconsistent.  Rather, these provisions demonstrate that GM did not have the right to name EAG as a Pontiac dealer on May 4, 2014, but had entered into an agreement that would allow it to make EAG a Pontiac dealer by May 15, 2004.  Additionally, even if these provisions were inconsistent, they have nothing to do with whether EAG would receive a rent subsidy in the event that GM discontinued the Pontiac brand.

Second, EAG argues that GM's bankruptcy rendered its performance under the Sublease impracticable.  The doctrine of impracticability excuses a party from performing its contract obligations where performance has become literally impossible, or at least inordinately more difficult, due to the occurrence of an unforeseen, supervening event.  *JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc.*, 67 A.3d 702, 709 (N.J. Super. Ct. App. Div. 2013).  Here, EAG's argument fails because the Sublease explicitly contemplates the loss of a franchise.  The Sublease discusses the parties' rights in the event that "[EAG] is not the Dealer under one or more of the valid and existing Dealer Agreements," but does not provide for a rent subsidy should that situation occur.  Decl. of Diane C. Hertz filed in Support of Argonaut's Mot. to Dismiss ("Hertz Argonaut Decl.") Ex. A ¶ 17.2, ECF No. 33 ("If at any time during the Term, Tenant is not the Dealer under one or more of the valid and existing Dealer Agreements,  (a) Tenant shall notify the Landlord . . . and (b) Landlord, by notice to Tenant, may designate a date on which this Lease shall terminate.").  Thus, EAG has not sufficiently alleged that GM's bankruptcy has rendered its performance under the Sublease impracticable.  The Court will dismiss Count V.

### D.  Breach of the Sublease (Count VI)

Count VI alleges that Argonaut breached the Sublease by failing to agree to a modification of the rent for the Buick GMC dealership facility after GM discontinued the Pontiac Brand. Def.'s Countercls. ¶¶ 123-24. The parties agree that New Jersey law governs all claims arising under the Sublease.

To state a claim for breach of contract under New Jersey law, a party must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages arising from the breach; and (4) that the party performed its own contractual obligations. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Here, neither the Sublease nor any other agreement referred to by EAG requires Argonaut to pay a subsidy or modify the rental payment for the Buick GMC dealership facility in the event that EAG loses the ability to sell a particular brand. This is true in spite of the fact that the Sublease explicitly contemplates the instant situation – the termination of a particular GM brand. *See* Hertz Argonaut Decl. Ex. A ¶ 17.2. Further, EAG did not respond to Argonaut's arguments seeking dismissal of Count VI. As explained previously, EAG's failure to respond to an argument seeking dismissal of a count constitutes waiver of that count. The Court will thus dismiss Count VI.

### E.  Reformation of the Sublease (Count VII)

In Count VII, EAG seeks to have the Sublease "reformed" to "provide for a rent subsidy or reduction." Def.'s Countercls. ¶ 110. To state a claim for reformation under New Jersey law, a plaintiff much allege (1) a mutual mistake, or (2) a unilateral mistake accompanied by fraud or unconscionable conduct by the defendant. *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 442 (D.N.J. 1998); *St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 443 A.2d 1052, 1055 (N.J. 1982). EAG grounds its claim for reformation on both mutual and unilateral mistake. Def.'s Countercls. ¶ 108-09.

#### i.  Mutual Mistake

EAG alleges that the rental amount stated in the Sublease was based on the parties' mutual understanding that EAG would be permitted to operate a dealership on the premises offering vehicles under the Pontiac, Buick and GMC brands. Def.'s Countercls. ¶ 107. The Counterclaims allege that "the parties were under a mutual mistake as to the purpose and use of the Premises and the appropriate amount of rent to be charged therefor." Def.'s Countercls. ¶ 108.

Mutual mistake exists only when "both parties were laboring under the same misapprehension as to a particular essential fact." *Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 659 (N.J. 1989). Furthermore, to state a claim for reformation based on mutual mistake, a plaintiff must allege "that the minds of the parties have met and reached a prior existing agreement, which the written document fails to express." *Id.* Here, EAG has failed to allege facts showing a mutual mistake requiring reformation of the Sublease. As noted previously, the Sublease clearly contemplates the possibility of EAG losing its

9

right to distribute a particular brand, and does not provide for a rent subsidy in that case. *See* Hertz Argonaut Decl. Ex. A ¶ 17.2. And even if EAG believed, in clear contradiction of the terms of the Sublease, that it would be entitled to a rent subsidy if it lost the right to distribute the Pontiac brand, the Counterclaims contain no indication that this mistake was mutual to both parties. *See Bank of Am.*, 2014 WL 809207, at *6 (quoting *Bonnco*, 560 A.2d at 659) (dismissing a claim for reformation based on mutual mistake because the plaintiff failed to demonstrate "that the parties 'met and reached a prior existing agreement, which the [Loan Agreement] fails to express.'") This Court thus finds that EAG has failed to allege a claim for reformation based on mutual mistake.

### ii. Unilateral Mistake

Alternatively, EAG alleges that it was operating under a unilateral mistake that it would receive a rent abatement if the Pontiac brand became unavailable and that Argonaut's failure to offer an abatement is unconscionable. Def.'s Countercls. ¶ 109. To state a claim for reformation based on unilateral mistake, a plaintiff must allege facts demonstrating both (1) a unilateral mistake and (2) either fraud or unconscionable conduct by the defendant. *St. Pius X*, 443 A.2d at 1055. Specifically, the plaintiff must allege that the defendant engaged in unconscionable conduct during the contract's formation. *Brodzinsky v. Pulek*, 182 A.2d 149, 156 (N.J. App. Div. 1962) (finding that plaintiff did not have a claim for reformation of certain mortgages based on unilateral mistake due to the lack of any evidence showing "inequitable conduct on the part of [the defendant] which caused these mortgages to be drawn as they were"). Here, the Counterclaims contain no allegations of fraud or unconscionable conduct by GM or Argonaut in connection with the Sublease's formation. The Court will thus dismiss Count VII.

### F. Breach of the Implied Covenants of Good Faith and Fair Dealing (Count X)

Finally, Count X asserts a breach of the covenants of good faith and fair dealing implicit in the Dealer Agreements. EAG alleges that GM has breached these implied covenants by (1) failing to enforce its policy of prohibiting brokered sales and (2) denying EAG the right to perform warranty work for the discontinued Saturn brand but granting that right to other nearby dealers. Def.'s Countercls. ¶¶ 42-46. EAG argues that this conduct has sabotaged its ability to meet GM's sales expectations.

While the parties agree that Michigan law applies to this claim, they disagree as to whether the Michigan Uniform Commercial Code (the "UCC") is applicable. The UCC applies to contracts for the purchase or sale of goods. When determining whether the UCC applies to claims arising under an automobile dealer agreement, Michigan courts have considered both the language of the contract and the subject matter of the litigation. *Wells v. 10–X Mfg. Co.*, 609 F.2d 248, 254-55 (6th Cir.1979); *Superior Pontiac Buick GMC, Inc. v. Nissan N. Am., Inc.*, 08-10642, 2011 WL 1344570, at *4-5 (E.D. Mich. Apr.

8, 2011). Where the dealer agreement characterizes itself as a "personal service agreement," and the case concerns the sufficiency of a party's performance of services under the agreement, the UCC does not apply. *Superior Pontiac Buick GMC*, 2011 WL 1344570, at *4-5 (holding that "an automobile dealer agreement that characterizes itself as a 'Personal Services Agreement' is a personal services contract, and not a contract for the sale of goods").

Here, the Standard Provisions specifically state that "this is a Personal Services Agreement, entered into in reliance on the qualifications, integrity and reputation of Dealer Operator . . . ." Hertz GM Decl. Ex. A Art. 2. And this is a case about the sufficiency of EAG's performance of services under the Dealer Agreements, and EAG's defenses thereto, not the purchase or sale of goods. Michigan common law, and not the UCC, thus applies to this claim.

Michigan common law recognizes an implied covenant of good faith and fair dealing in certain circumstances, depending on the nature of the parties' contractual arrangement. However, "Michigan law does not imply the good faith covenant where the parties have clearly expressed their respective rights." *Gen. Motors Corp. v. New A.C. Chevrolet*, Inc., 263 F.3d 296, 334-35 (3d Cir. 2001) (quoting Hubbard Chevrolet Co. v. Gen. Motors Corp., 873 F.2d 873, 877 (5th Cir. 1989). Moreover, the duty of good faith and fair dealing can arise only in connection with specific contractual obligations. *Cutrone v. Daimler-Chrysler Motors Co., LLC*, 160 F. App'x 215, 218-19 (3d Cir. 2005). "The implied covenant of good faith and fair dealing essentially serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms." *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 876-77 (5th Cir. 1989). "[A]n implied obligation to act in good faith can arise when, for instance, the specific contractual terms make a party's performance under the contract entirely discretionary." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333-34 n.23 (3d Cir. 2001); *Burkhardt v. City National Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. App. 1975) ("Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.").

Here, the contract explicitly sets forth the parties rights as to brokered sales. The Dealer Agreements prohibit dealers from engaging in brokered sales without obtaining written consent from GM, but do not impose any duties or obligations on GM as to brokered sales. And none of the contractual language referenced by EAG places any specific contractual obligation on GM regarding the circumstances under which it may permit brokered sales or how it should distribute the warranty work for other brands. EAG has thus failed to allege any specific contractual obligation anchoring its claim for breach of the implied covenant of good faith and fair dealing. The Court will dismiss Count X.

The Court therefore finds that each of Counts IV, V, VI, VII, VIII, and X fails to state a claim under Rule 12(b)(6). The Court will **DISMISS** those Counts **WITHOUT PREJUDICE**. Because the Court finds that EAG has failed to allege the elements of those claims, the Court has not reached the issue – which was raised in both GM's and Argonaut's moving papers – of whether EAG has waived some of those claims.

### III.   EAG'S CROSS-MOTION TO AMEND

EAG cross-moves to for leave to file amended counterclaims and provided a proposed amendment with its moving papers. The proposed amendment: (a) adds a claim for reformation of the Business Plan Agreement concerning the Pontiac Rent Subsidy; (b) withdraws EAG's claim for breach of the Sublease against Argonaut; and (c) withdraws EAG's breach of contract claim against GM relating to the denial of Saturn warranty work. Declaration of Russell P. McRory in Opp'n to GM's Mot. to Dismiss and in Support of Def.'s Cross-Mot. Ex. D, ECF No. 43-2.

EAG's request to withdraw its claims for breach of the Sublease and breach of the Dealer Agreements in connection with the Saturn warranty work is denied as moot, because the Court has dismissed those claims. EAG's request to amend the Counterclaims to assert a claim for reformation of the Business Plan Agreement to reinstate the Pontiac Rent Subsidy is denied as futile, because the proposed new count fails to state a claim. As with EAG's claim seeking reformation of the Sublease, the proposed claim fails to allege facts showing either mutual mistake or unilateral mistake coupled with fraud or unconscionable conduct. *See St. Pius X*, 443 A.2d at 1055. Thus, EAG may not file the amendment as proposed. However, given the Third Circuit's demonstrated liberality toward amendments under Federal Rule of Civil Procedure 15(a), the Court will grant EAG thirty days to file amended counterclaims consistent with this Opinion.

### IV.   CONCLUSION

For the reasons stated above, GM's and Argonaut's motions to dismiss are each **GRANTED**. Counts IV, V, VI, VII, VIII, and X are **DISMISSED WITHOUT PREJUDICE**. EAG's cross-motion to amend is **GRANTED**. The Court shall grant EAG thirty days to file amended counterclaims consistent with this Opinion. An appropriate order follows.

　　　　　　　　　　　　　　　　　　　　　/s/ William J. Martini
　　　　　　　　　　　　　　　　　　　　**WILLIAM J. MARTINI, U.S.D.J.**

**Date: September 9, 2014**